## IN THE UNITED STATES BANKRUPTCY COURT
## FOR DISTRICT OF DELAWARE

IN RE:                                          (
                                                (
Combustion Engineering, Inc.         ( Bankruptcy No. 03-10495 JKF
                                                (
                                                (
        Debtor(s)                           ( Chapter 11

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
## CORE MATTERS AND
## PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND
## RECOMMENDATIONS TO THE DISTRICT COURT WITH RESPECT TO
## NON-CORE MATTERS

The matter before the court is the approval of Combustion Engineering, Inc.'s

("Debtor" or "CE") Disclosure Statement and confirmation of its prepackaged Plan.

Throughout the course of the hearings on the Disclosure Statement and Plan, the Plan was

modified in several respects and many objections to Plan confirmation were resolved.

Regarding the Disclosure Statement, there were objections but the parties took depositions,

looked at documents and had the opportunity to further explore issues at a meeting that was

held in Houston, Texas. A Committee was appointed and also performed due diligence. The

information provided through all these avenues satisfied the Committee, and this Court is

satisfied, that there was sufficient information in the Disclosure Statement to provide

"information of a kind, and in sufficient detail, as far as is reasonably practicable in light of

the nature and history of the debtor and the condition of the debtor's books and records, that

would enable a hypothetical reasonable investor typical of holders of claims or interests of the

1

relevant class to make an informed judgment about the plan."[1]  11 U.S.C. §1125(a)(1).  The
Plan has been modified through the course of the trial but that fact does not affect the
adequacy of the Disclosure Statement, although it no longer matches the Plan in all respects.
All constituencies were represented in court and either have agreed to the changes or their
objections to the Disclosure Statement have been overruled.  The Disclosure Statement
contained adequate information to enable the impaired creditors (Classes 5, 6, and 7), to vote
on the Plan.  Class 5 (Asbestos PI Trust claims) voted in favor of the Plan.  Class 6, the Non-
Debtor Affiliate Intercompany claims, is impaired (but there are no claims in this class), and
Class 7, Equity, voted in favor of the Plan.  The Disclosure Statement is approved.

However, I recommend that confirmation of the Plan as modified through June 4,
2003, be withheld and that an opportunity be provided to the Plan Proponents to submit
additional information regarding ABB Lummus Global, Inc. ("Lummus") and Basic, Inc.,
affiliates of Debtor, so that the Plan may be confirmed.  There are two issues, which will be
addressed later in more detail concerning a §105(a) injunction, the first concerning notice to
and votes by Lummus' creditors and Basic's creditors.  I acknowledge that an advertisement
was placed in the Wall Street Journal but the testimony is unclear what Debtor did to identify
independent claimants of Lummus and Basic.  I recommend that the Debtor be provided an
opportunity to file an affidavit and produce a witness for a trial deposition on cross-
examination with respect to what if any effort was made to identify, notify and solicit votes

---

[1]The existence of insurer indemnities was not in the Disclosure Statement and Mr.
Austern was concerned about that but the issue was resolved when insurer claims were taken
out of Class 5 (Asbestos PI Trust claims) and put in Class 4 (general unsecured claims) or
Class 3 (workers' compensation).  The claimants affected were represented at the trial so there
is not a Disclosure Statement issue with respect to this point.

2

from creditors with claims against only Lummus and not shared with CE and against only Basic and not shared with CE. The testimony established that Lummus and Basic creditors culled from CE's records voted. The testimony does not establish whether Lummus' records and Basic's records were utilized to develop the notice list. I recommend withholding confirmation until such an affidavit and deposition transcript are filed and if they do not establish some direct notice to those holding non-derivative claims against Lummus and Basic, I recommend that Debtor be required to notify and solicit the direct Lummus and Basic creditors before confirmation is approved.

The second issue concerns payments to Lummus and Basic direct creditors. I find that although David Austern, the Futures Representative, testified that he would serve as the Futures' Representative for both Lummus and Basic and that there is a separate "pot" of money for CE and a separate pot for Lummus and a separate pot for Basic, there are no documents filed of record to support the existence of the separate funds. I also accept Mr. Austern's testimony that contribution into these separate pots provides such a significant ratio of funds available to pay claims that the Plan can be confirmed as these amounts will provide the opportunity to pay any non-accepting creditor of Lummus or Basic. This is needed because all shared insurance will pay only CE's creditors, not those of Lummus or Basic. However, the CE Trust Distribution Procedure document provides that it "does not address Basic Asbestos Personal Injury Claims, Basic Derivative Asbestos Personal Injury Claims, Lummus Asbestos Personal Injury Claims, or Lummus Derivative Asbestos Personal Injury Claims." Furthermore, the Asbestos PI Trust Agreement provides that TDP "procedures will subsequently be adopted respecting" the Basic and Lummus "Asbestos Trust Claims".

3

I recommend that confirmation be withheld to give the Debtor an opportunity to file appropriate document(s) that will establish the funds and the distribution processes for Lummus and for Basic.

Except where specifically noted to the contrary, I accept and adopt as my findings all of the evidence summarized below. Objections to the Plan were filed by numerous parties. All have been resolved except those of the "Certain Cancer Claimants" ("CCC") and certain non-participating insurers. Because the Plan has been amended several times as these proceedings occurred, I believe it will be more instructive to deal with the objections and the evidence collectively, rather than to separate out each objection. I overrule all objections to core matters and recommend that the District Court do likewise as to all non-core matters except with respect to the injunction as to Lummus and Basic, until the supplemental documents are filed. I have attempted to include all of the findings I agreed to place into the findings or the Order at various times throughout the trial and arguments. If I failed to include any, it is through inadvertence and I ask the parties to direct me to the appropriate transcript references for my reconsideration.

CE filed its petition under chapter 11 on February 17, 2003, with a Disclosure Statement and Plan. On the date of filing, CE was a wholly owned subsidiary of Asea Brown Boveri, Inc. ("US ABB"). ABB Limited is the ultimate parent of US ABB and CE. *See* CE Conf. Hrg. Exh. 111a (illustrating corporate structure of the ABB Group). The combined hearing on the Disclosure Statement and Plan of reorganization was held on April 24, May 1, May 2, May 12, May 13, May 23, May 27 and June 3, 2003. The evidentiary portions occurred on April 24, May 1, May 2, May 12 and May 13. Arguments and motions were

4

heard on the other dates.

CE's asbestos problems began in the mid-1960s[2] and the number of asbestos claims increased through the years but did not have a material effect until the mid-1990s. As of the date of the filing of the bankruptcy it had approximately $198 million in face amount of available insurance; however, certain carriers dispute coverage. Before the mid-1990s approximately two-thirds of asbestos payments made by CE were reimbursed by insurance. Since then available insurance proceeds have declined. In 2001 and 2002 some insurers took the position that only about one-third of CE's asbestos liability payments were reimbursable. From 1990 to 2002 CE paid $950 million in asbestos claims of which only $517 million was reimbursed or reimbursable by carriers. These factors left CE unable to pay its asbestos obligations without significant capital contributions from its parent, US ABB, which it obtained. In and after May 2000 US ABB contributed $482 million to CE in the form of $100 million cash so that CE could pay the uninsured portion of its asbestos liabilities and approximately $400 million in a note. In May of 2000 US ABB contributed another $200 million in cash to CE and in March, 2002, another $200 million in cash. *See* Brett Affidavit at ¶ 21. CE has exhausted its primary insurance coverage for products liability or has settled with its primary carriers and its excess insurers are disputing liability.

By the fall of 2002 CE had no source of liquidity absent funding from ABB and

---

[2]CE has also been sued as successor-in-interest to some of the companies it acquired. By the mid-1970s it was subject to a few hundred asbestos claims a year but there was no noticeable impact on its financial health until the mid-1990s. Since 1989 there has been a dramatic increase in asbestos-related claims filed against CE and there are currently approximately 160,000 asbestos personal injury claims and five asbestos-related property damage claims against CE and its affiliates.

ABB's financial problems were exacerbated by CE's asbestos liability. Beat Hess, ABB
Limited's general counsel, testified that if the banks had not been prepared to refinance the
ABB $1.5 billion debt that was due mid-December of 2002, ABB would be "bankrupt". NT
4/24/03 at 224 (Hess). Further, if ABB and US ABB could not refinance, CE would not have
been able to access the $402 million note on which US ABB was obligated to CE. *Id.* at 230.
This note was one of CE's more significant assets.

      There is no dispute that unless something was done about CE's asbestos liabilities and
soon, ABB's access to financing would be terminated and that ABB's financing was and is
critical to CE's liquidity.

      US ABB acquired CE's stock in 1990[3] but the acquisition was not successful in light
of the capital infusions required to maintain CE's solvency. NT 4/24/03 at 218 (Hess).
During the 1990s the ABB group underwent rapid growth through acquisition of companies
related to the power technology business. By early 2002 it was one of the world's largest
power technology companies and had become known as the "GE of Europe". By that time
also it was facing crushing debt with respect to the acquisitions. On December 15, 2002, $1.5
billion repayment was due and another $2.1 billion is due sometime in 2003. Due to a debt
downgrade, ABB Limited's historical sources of liquidity were no longer available. The huge
debt coupled with reduced demand and CE's rising asbestos liabilities threatened ABB's
survival. Indeed, ABB Limited's lenders insisted that it find a resolution to the problem of

---

[3]The acquisition was by way of a leveraged buyout for $1.6 billion. Between 1990 and
1995 CE sold 32 businesses to abate losses but during the 1990s it lost more than $1.3 billion.
It operated its nuclear power division until 1999 and continued to manufacture air pre-heater
facilities, coal pulverizers and other heat exchange facilities.

CE's asbestos liabilities before they would lend it any more money. Further, creditors were voicing an inclination to institute an involuntary bankruptcy against US ABB. Beat Hess, ABB Limited's general counsel, testified on direct that as long as there are asbestos liabilities within the ABB group, its credit facility would run out and it could not repay debt. NT 4/24/03 at 245-46 (Hess).

In order to resolve its financial problems, ABB began a divestment and restructuring plan.[4] The divestment program cannot be completed unless ABB Lummus Global, Inc. ("Lummus"), an affiliated company, and the Oil, Gas and Petrochemical ("OGP") division of ABB of which Lummus is a part can be sold.[5] ABB Limited's financial viability depends on putting Lummus into a condition to be sold, which it will not be if burdened with asbestos liabilities unless those asbestos liabilities are defined and funded. Mr. Hess testified on cross-examination that if Lummus were sold ABB Limited agreed it would retain responsibility for Lummus's liabilities. Lummus's value with its liabilities would be zero. NT 4/24/03 at 272 (Hess). In addition, Mr. Hess testified on direct that as long as there are asbestos liabilities

---

[4]Joseph J. Radecki, Jr., an investment banker at CIBC World Markets Corp., testified in support of the Plan. He was retained by the Future Claimants' Representative, David Austern. NT 5/2/03 at 60-61 (Radecki). Although the restructuring programs ABB has undergone (three in the past six years) have been expensive for ABB, they have not been unsuccessful, although ABB has not realized all the benefits it was seeking. NT 5/2/03 at 90-91 (Radecki). At the time of Mr. Radecki's testimony, ABB had just reported first quarter numbers showing significant growth in EBIT margins and revenues for its core businesses. *Id.* at 91. It also seemed to be gaining market share in some of its core businesses. *Id.* at 105. Mr. Radecki testified that ABB's business plan was aggressive but that it was beginning to show progress, particularly with respect to its core businesses. NT 5/2/03 at 77 (Radecki).

[5]The banks determined which ABB Limited businesses had to be sold and the OGP business was one of them but cannot be sold as long as Lummus has asbestos exposure. *See, e.g.*, NT 4/24/03 at 250 (Hess).

7

within the ABB group, its credit facility would run out and it could not repay debt. NT

4/24/03 at 245-46 (Hess). Further, Lummus and Basic, Inc., another nondebtor affiliate, share

some insurance with US ABB that is part of the funding for CE's Asbestos PI Trust

(postpetition trust). The Plan Proponents assert that if lawsuits against Basic and Lummus

continue, the shared insurance may not be available to fund CE's Plan.

Prepetition insurance settlements with CE represent a stream of payments of

$90,500,000. NT 5/2/03 at 142 (Zilly).[6] There is $198 million in aggregate unexhausted

excess insurance policy limits but certain carriers dispute coverage. Id. at 148, Brett

Affidavit. CE's books reflect only a conservative $148.7 million in light of possible insurer

insolvencies or timing issues with respect to collectability. Id.

CE also has environmental liabilities[7] the most significant of which are in connection

_____

[6]Pamela Zilly, senior managing director at the Blackstone Group, testified as an expert as to CE's liquidation value, among other things.

[7]Effective July 1, 1999, all of CE's stock was transferred to a joint venture known as ABB Alstom Power. The joint venture was between CE's ultimate parent, ABB, and Alstom. CE retained all of it asbestos liabilities but the company was conveyed with its liabilities to the joint venture. There were two indemnities related to those liabilities. In a 1999 Transfer Agreement, US ABB agreed to reimburse CE for the uninsured portion of asbestos-related claims open and pending as of June 30, 1999. CE undertook to indemnify and defend US ABB for any CE asbestos liability claim asserted against US ABB after June 30, 1999.    In May, 2000, the joint venture was dissolved due to business differences between US ABB and Alstom including a dispute over liability for asbestos-related claims against CE. US ABB therefore purchased CE's stock but due to an intervening transfer in late December, 1999, of what was CE's fossil power generating assets to a subsidiary of the joint venture then owned by Alstom, CE's only remaining operating asset is certain real property in Windsor, Connecticut, although CE retains some cash and has some insurance assets. It also had a note in the range of $400 million on which US ABB was obligated. NT 4/24/03 at 229 (Hess). As part of the dissolution of the joint venture, US ABB agreed to indemnify the Alstom entities for asbestos-related claims asserted against them based on their prior affiliation with CE or ownership of CE's assets. CE's current business consists of leasing real property in Windsor, (continued...)

8

with a kyanite mine in Georgia and a former nuclear components facility in Connecticut. The Disclosure Statement states that the environmental liabilities are in excess of $100 million, and Pamela Zilly, senior managing director at the Blackstone Group, testified that $224 million was an estimate of a possible upper range of the cost in light of the existence of numerous regulatory bodies involved and a general lack of consensus with respect to the responsible party. NT 5/2/03 at 153 (Zilly). The cleanup cost at the Georgia site is approximately $200,000 per year. CE is not seeking to discharge the remediation liability but under the Plan US ABB will assume responsibility for it. US ABB will also assume remediation at CE's Connecticut site where CE used to manufacture nuclear components for the Navy and the Atomic Energy Commission and later produced commercial nuclear fuel.

In October 2002, CE began initial discussions with Joseph F. Rice regarding the broad economic parameters of a plan. Mr. Rice is a plaintiffs' attorney with over 20 years experience in asbestos litigation. He is a member of the Manville Trust Advisory Committee ("TAC"), served as claimants' representative in the Shook & Fletcher bankruptcy, and served on claimants' negotiating committees in the Pittsburgh Corning and Babcock & Wilcox bankruptcies, among others. Mr. Rice also has experience with prepackaged plans of reorganization for debtors with asbestos liabilities, including Shook & Fletcher and J.T. Thorpe. NT 5/1/03 at 38-39 (Rice).

The first discussion with Mr. Rice concerning a CE bankruptcy took place on October 22 and 23 of 2002 in Zurich, Switzerland. At the meeting, representatives of ABB provided

---

[2](...continued)
Connecticut, and conducting remediation with respect to that property.

9

Mr. Rice with a presentation on ABB's financial condition and historic transactions between ABB and CE. Mr. Rice then put forth a proposed structure for the reorganization of CE. The structure was based on what had been done in Shook & Fletcher in which Mr. Rice had actively participated and to which most of the insurers in that case eventually agreed. NT 5/1/03 at 40-41 (Rice).

By the end of October 22, 2002, the parties had arrived at a basic structure of a prepackaged plan. This basic structure was memorialized in a Memorandum of Agreement ("MOA") initialed on the morning of October 23, 2002, by representatives of the parties in interest. The basic structure of the deal was: (1) a prepetition settlement trust funded by half the value of CE, now referred to as the CE Settlement Trust; (2) a bankruptcy trust funded by the other half of the value of CE and augmented by a cash and stock contribution from ABB, known as the postpetition Asbestos PI Trust; and (3) the release of certain parties, including ABB, US ABB, and Alstom. In addition, it was critical to ABB that Lummus and Basic be included in the § 524(g) injunction. NT 4/24/03 at 245-47 (Hess). As noted earlier, Mr. Hess testified that as long as asbestos liability exists within the ABB group in the United States, ABB would continue to have the problems it has had; i.e., when its current credit facility runs out there is still more than $2 billion due for repayment at the end of 2003 that it will not be able to repay and for which it cannot obtain more financing due to asbestos exposure. NT 4/24/03 at 245-46 (Hess). Mr. Hess testified that Lummus must be included in the §524(g) injunction because, in order for ABB to pay its debt, it must divest certain businesses, the OGP division, of which Lummus is a part, being one of them. Id. at 246-47 (Hess). The sale of the OGP business has been dictated by ABB's banks, id. at 247 (Hess), and the OGP

10

business cannot be sold as long as Lummus has asbestos liability. *Id.* at 247 (Hess).

Furthermore, shareholders will not contribute as long as there is asbestos exposure. *Id.* The

same analysis applies to Basic's asbestos problems.   Basic and Lummus handled asbestos

related materials and are defending claims that are not purely derivative of their corporate

relationship with Debtor.[8]  Basic faces approximately 3,500 suits at this time.  Pending against

Lummus are currently approximately 7,600 cases.

     It was decided at the meeting in Zurich in October of 2002 that Mr. Rice would

negotiate a prepetition settlement structure that he could recommend to his clients and that he

thought would be acceptable to other law firms representing current asbestos claimants.  The

purpose was to buy immediate peace from the thousands of asbestos lawsuits (pending and

potential) against CE so that CE could file a prepackaged bankruptcy plan rather than face a

freefall bankruptcy.  It was anticipated that the other law firms would independently evaluate

the merits of the proposed deal and that they would be free to negotiate with CE on behalf of

their own clients.  It was also agreed that an independent, fully funded future claimants'

representative would have to be selected to represent the interests of the unknown asbestos

personal injury claimants.  NT 5/1/03 at 87 (Rice).  Mr. Rice was determined to be a good

choice to serve as facilitator with other asbestos plaintiffs' firms due to his experience with

asbestos mass tort cases and his familiarity with the plaintiffs' bar.

     After the MOA was executed negotiations proceeded in earnest and resulted in a

Master Settlement Agreement ("MSA") and related agreements.  The terms of the MSA were

---

    [8] It is the creditors with non-derivative claims who may not have been solicited with
respect to this Plan.

resolved in large part by November 14, 2002. Mr. Austern was asked to serve as the Futures Representative. He and/or his professionals had become involved and were beginning due diligence. After the MSA was formalized Mr. Austern began active involvement in the negotiation of the Plan. His concern was the amount available for future claimants.

Mr. Rice testified about the MSA. He testified that he worked closely with John Dickhoff, president of CVCSC who provided data covering the period September 2002 through November 14, 2002, concerning the volume of cases that had been presented to CE. Mr. Dickhoff provided this information categorized by law firm, by jurisdiction, and, to the best of his ability, by disease. Mr. Dickhoff also provided Mr. Rice with historical settlement data for each law firm in each jurisdiction as it changed over a period of time, as well as substantial additional data that was summarized in chart form at trial.  Mr. Rice analyzed that data and was comfortable that with the volume of cases represented to be in existence as of November 14th, in conjunction with the historical settlement averages, there was enough money in the trust even if the figures were off by 21 to 25 percent. The CE Settlement Trust provided for three categories of distribution, depending upon how long a claimant's case had been pending resolution.  Category 1 claimants would be paid 95 percent, Category 2 claimants 85 percent, and Category 3 claimants 75 percent of their settlement.  There was a safeguard to the sufficiency of funding in that Category 3 cases would be paid half of the 75 percent they were to receive. These Category 3 claimants recognized the possibility that they would not get the other 37½ percent, because it was set for a proration payment of monies available after the payment of claims in Category 1 and Category 2.  However, it became clear that the data provided by Mr. Dickhoff was not accurate.  Although Mr. Rice had anticipated,

due to his experience in the mass tort asbestos area, that the data would be off by
approximately 25 percent, it turned out that there were two or three major law firms that had
cases that met the definition of eligible claimant under the MSA and were in jurisdictions that
had high historical payment averages. Once that volume of 25,000 or 30,000 additional
claimants was added in, the payments as originally agreed upon could not be made.
Accordingly, Mr. Rice spoke with counsel for ABB Limited and others, including an attorney
who represents a substantial number of New York asbestos claimants (15,000 to 20,000), one
who represents only mesothelioma cases and others. There were a total of four law firms and
they reached an agreement with ABB Limited's counsel. As a result, a Category 4 was
proposed that would benefit from additional financial contribution for ABB Limited in the
amount of approximately $30 million. These claimants would also have the right to come into
the MSA but, as Mr. Rice put it, only on the back end. The Category 4 claimants agreed to
take less than 37½ percent. They could not dilute the 37½ percent that was going to the
Category 3s inasmuch as those claimants had agreed to the MSA on the basis of the first 37½
percent. This agreement was memorialized in the supplemental MSA. In order to know the
amount of money needed for Categories 1, 2, and 3 before Category 4 could be paid, deadlines
had to be imposed. This was necessary to avoid diluting the 37½ percent. NT 5/1/03 at 72-76
(Rice).[9] The deadline chosen was November 14, 2002, which was the day the terms were

---

[9]Category 1 claimants were those who were to receive 95 cents on the dollar. These
were the claimants it was feared might force an involuntary inasmuch as they either had
judgments or settlements and had been waiting some time for their money.

Category 2 claimants were people who were not quite as far in the process but  had
done everything they were supposed to do. That is, they had entered into a settlement
agreement, or agreed to a resolution process. They had presented their information, and the
(continued...)

13

finalized.

The CE Settlement Trust consisted of a cash deposit of $5 million, a promissory note from Debtor payable to the CE Settlement Trust in the principal amount of approximately $100 million (the "CE Note"), assignment of a loan agreement between US ABB as borrower and Debtor as lender under which US ABB agreed to pay $402 million upon demand by Debtor (the "US ABB Loan") and a guaranty by ABB Limited of the CE Note and the US ABB Loan.

The agreement reached by the parties that was eventually announced in January of 2003 was among ABB Limited, US ABB and CE on one hand and Mr. Austern and Mr. Rice on the other hand. Pursuant to the MSA the CE Settlement Trust was established and was funded by CE prepetition on or about November 22, 2002. The consideration for this contribution by CE was an agreement that Mr. Rice, who was designated as the Claimants'

---

[9](...continued)

Debtor had promised payment in a specific amount to a specific plaintiff, for a specific disease, to be paid on a specific date. These claimants would receive 85 cents on the dollar. The payment date was after November 14 but within 90 to 120 days.

The Category 3 claimants were to get 75 percent but only 37½ percent through the prepetition CE Settlement Trust. They understood that the other half would be paid only if and when payments to Category 1 and Category 2 claimants were completed. *Id*, at 72. Once the problem noted in the text came to light (i.e., that Mr. Dickhoff's information was not completely accurate), Category 4 was created.

The proposal was to pay all claimants the fixed percentage of their entitlement through the assets that were to go into the prepetition CE Settlement Trust. These claimants would then look to the §524(g) plan trust for the other part of their compensation. The portions to be paid through the plan trust were the so-called "stub" claims. These claimants understood that payment of the stub would be made only if there were funds to pay it. NT 5/1/03 at 71-72 (Rice).

14

Representative in letters to asbestos claimants regarding voting on the prepetition plan,[10] would submit the proposal to asbestos personal injury claimants who would be eligible to participate and the attorneys for those claimants. Mr. Rice would also recommend to claimants and their counsel that they accept the MSA. Mr. Rice testified that the other plaintiffs' lawyers would not simply rely on his suggestion that their clients sign on to the MSA. NT 5/1/03 at 55 (Rice). He himself represented only his own clients. *Id.* at 53-54 (Rice).

Mr. Rice testified that both he and John Dickhoff, president of CVCSC initiated discussions with law firms who had clients with asbestos claims against Debtor in order to sign people up for the MSA. NT 5/1/03 at 78 (Rice). When a law firm informed Mr. Rice that it was interested in the MSA, Mr. Rice would receive information from the firm regarding its volume of cases that met eligibility requirements and information regarding the historical average, or values, by disease. He would then get the same type of information from CVCSC and to the extent there were discrepancies, he, the law firm, and Mr. Dickhoff would work to resolve the differences. *Id.* Where there were already settlement agreements in existence the same agreements were used but the time frame was expanded. *Id.* at 79. Mr. Dickhoff, however, made the ultimate decisions.

Participation in the MSA was offered to all prepetition claimants. It was not

---

[10]The letter which is CE Exhibit 22 was sent to known asbestos claimants who were being asked to sign on to the MSA and the Plan prepetition. Mr. Rice was asked why he signed as "Claimants' Representative" when he sent letters to claimants but did not use that designation when communicating with counsel. He did not have an answer. However, he testified that "[k]nowing the asbestos plaintiffs' bar", no claimants would assume that he was representing their interests. NT 5/1/03 at 138 (Rice). *See also id.* at 137-38.

conditioned upon a favorable vote on the proposed plan -- neither claimants' lawyers nor their clients were required to vote for the outline of the Plan but merely asked to indicate a non-binding approval of the outline. The MSA provided that counsel for claimants would undertake, consistent with their ethical duties and in light of the individual circumstances of the each claimant, to recommend to each claimant acceptance of the prepackaged Plan. There was no requirement that claimants signing the MSA vote in favor of the Plan, and it was fully expected that they would exercise their own independent judgment.[11]  To further explain the process, CE and US ABB held a meeting in Houston, Texas, on February 12, 2003. There were approximately 75 to 100 plaintiffs' attorneys present and they were told that signing up for the MSA did not require them to vote in favor of the Plan. Similarly, to vote for the Plan prepetition the claimant did not have to execute the MSA. NT 5/2/03 at 245 (Dickhoff).

The purpose of the CE Settlement Trust was to compensate people who already had claims in the tort system or on file with CE and to provide CE with a reprieve from litigation. In order to do that, a cutoff had to be established to prevent a huge influx of claims once the MSA was set up. As Mr. Rice testified, if you announce that you have a fund of money, everyone will come forward with claims in an attempt to obtain part of that fund. Since a percentage was to be paid through the CE Settlement Trust, there had to be fixed data regarding the volume of cases and their historical values. NT 5/1/03 at 63 (Rice). All

--------

[11]Mr. Rice testified that the MSA provided that by signing it the claimant was "committing to support the bankruptcy plan of CE, if it is consistent with the negotiated memorandum of understanding." NT 5/1/03 at 84 (Rice). However, the testimony and evidence at trial did not establish that those executing the MSA were bound in any way to vote in favor of the Plan prepetition.

16

claimants were made the offer to participate in the MSA. More than 13,000 claimants executed the MSA. No advance notice of the cutoff was provided to any plaintiffs' counsel. I find that selection of November 14 was fair to all claimants.

The MSA was amended on or about January 29, 2003, to offer additional holders of asbestos-related personal injury claims the opportunity to enter into the MSA agreement through February 20, 2003, and to thereby qualify to receive payments under the MSA. This offer remained outstanding through February 20, 2003, in accordance with the terms of the amendment. The chapter 11 was filed on February 17, 2003. The bankruptcy was filed earlier than originally anticipated due to pressures on the parent, ABB. Since the filing of the bankruptcy, the Debtor has entered into numerous Adoption Agreements whereby the claimants executing the Adoption Agreements will become participants in the CE Settlement Trust.

In 1983, CE and its primary insurers entered into a settlement agreement under which Travelers Indemnity Company exclusively handled CE's asbestos claims. In 1989, CE and Travelers entered into an agreement under which CE became solely responsible for handling its asbestos claims. Since then, CE has delegated claims handling responsibility to Connecticut Valley Claims Service Company ("CVCSC"). The procedures under the MSA were the same procedures CE had used, at least since 1986 when Mr. Dickhoff began working for CVCSC. NT 5/2/03 at 216, 220 (Dickhoff). This involves review of evidence of exposure to a CE product and medical and diagnostic criteria. I credit Mr. Dickhoff's testimony that CVCSC evaluated and continues to evaluate each claim and its supporting documentation before paying any creditor. Once the CE Settlement Trust was established, CE paid the claims

17

of those who qualified and agreed to the MSA. These payments continued postpetition but a certain portion of each claim, the "stub" claim, remains unpaid. Those with stub claims were eligible to vote on the Plan.

The CE Settlement Trust was created on November 22, 2002, for the purpose of holding assets and to process and pay those qualified to receive payments under the terms of the MSA and who executed releases and agreed to other covenants required by the MSA. As noted earlier, the CE Settlement Trust was funded with three principal assets of CE: assignment of a note from US ABB, a CE promissory note for approximately $100 million, and $5 million in cash. This constituted approximately half of CE's assets. NT 5/1/03 at 68 (Rice).

In November 2002, the process of conducting an extensive due diligence review of CE and its business was commenced. First, financial due diligence was conducted by an investment banker, Loreto Tersigni. Mr. Tersigni was retained by several asbestos plaintiffs' law firms, including Baron & Budd, to conduct due diligence into ABB's financial condition and the nature of the financial transactions that had taken place between ABB and CE. Mr. Tersigni has worked for claimants or claimants' committees in numerous asbestos bankruptcies and had provided advice to the National Association of Attorneys General in the tobacco industry litigation. Mr. Rice would have retained Mr. Tersigni himself but he had already been retained by another. Mr. Tresigni was hired to examine Debtor's financial condition and events prepetition to identify possible fraudulent transfers. NT 5/1/03 at 88 (Rice). However, Mr. Rice got the benefit of Mr. Tresigni's due diligence and relied on Mr. Tersigni and others. *Id.* at 47, 88 (Rice). Mr. Rice verified data he had been given

18

regarding CE. *Id.* at 44-45 (Rice).

Mr. Austern, Futures Representative, testified that he did his own due diligence and had sufficient time to conduct it. NT 5/1/03 at 283 (Austern). Scott Gilbert of Gilbert Heintz & Randolph LLP testified that his firm examined insurance assets for the Futures Representative. Mr. Austern charged Mr. Gilbert's firm with reviewing the insurance assets to determine whether they were equal to or in excess of the dollar estimate provided by the debtor. NT 5/1/03 at 239 (Gilbert). His firm reviewed the insurance policies with respect to settlement agreements and the agreements themselves, and interviewed policyholders as to their understanding of the settlement agreements. The firm obtained information on policy consumption in order to understand what available coverage remained. NT 5/1/03 at 238-39 (Gilbert). Mr. Austern testified that he hired Mr. Gilbert because he was "well aware of the specialized nature of what [he] does and the specialized nature of insurance" and that he was not aware of any other firm that had the same reputation for competence in the insurance practice field. NT 5/1/03 at 284 (Austern).

Mr. Austern also retained Joseph Radecki, an investment banker with CIBC World Markets Corp., to investigate the financial condition of ABB and its ability to contribute to the Asbestos PI Trust. NT 5/1/03 at 285 (Austern).

Mr. Austern retained FTI Consulting to examine fraudulent transfer issues in light of the fact that so much money moved in and out of CE over a relatively short period of time. NT 5/1/03 at 285 (Austern). Such an examination was also necessary, in Mr. Austern's view, because of the length of ABB's involvement with CE. *Id.* Mr. Austern wanted to know if the corporate veil could be pierced so that asbestos claimants could look to levels higher than CE

19

in the corporate structure. *Id.* His advisors informed him that potential fraudulent transfer claims were worth on their face between \$63 million and \$538 million. *Id.* at 295 (Austern). This estimate, however, did not include an assessment of collectability nor of the costs of litigation. *Id.* at 295-96 (Austern). With respect to piercing the corporate veil, although there were some overlapping directors and a central treasury, there were separate books and records, separate businesses and separate employees. NT 5/1/03 at 296-97 (Austern). Mr. Austern concluded that proving the case would be very difficult and extremely expensive and arguably any judgment would be uncollectable. *Id.* at 297. To be clear, there were, for purposes of this opinion, two different categories of possible fraudulent conveyances: one involved the money that went to the CE Settlement Trust prepetition and the other was related to the joint venture with Alstom. *See, e.g.,* NT 5/2/03 at 179-81 (Zilly). Insofar as the contributions to the CE Settlement Trust and the unwinding of the Alstom joint venture might give rise to fraudulent transfers, Ms. Zilly of The Blackstone Group, CE's financial advisor, testified that the amount of money that ABB put into CE was so great that setting aside fraudulent transfers, assuming any could be proven, would produce no benefit for the estate. I credit the testimony. In Ms. Zilly's opinion, none of the possible fraudulent conveyances would be worth pursuing. *Id.* at 181.[12] I find that the evidence supports her view. Based on

---

[12]Ms. Zilly testified that she

> looked at ... all of the supporting documentation, the financial records, the legal documents and the valuations associated with the formation of the joint venture, as well as the unwinding of the joint venture and evaluations that were available as of those points in time. And we also looked at the contributions that US ABB has made to Combustion Engineering over that period of time, and again, based on the facts and circumstances of those

(continued...)

20

this testimony regarding the unlikelihood of a recovery on the fraudulent transfer claims, I

find for Plan confirmation purposes that there is no value to those potential claims.[13]

Ms. Zilly testified that she participated and assisted in the due diligence efforts of Mr.

Tresigni for the asbestos claimants, Mr. Austern, and ABB's financial advisor, Lazard Freres.

NT 5/2/03 at 135.  Mr. Hess testified that ABB Limited cooperated fully throughout the due

diligence process; it opened its books and gave access to all documents that were requested.

NT 4/24/03 at 239-40 (Hess).  He testified that there were "absolutely no limits" on the

information that would be made available. *Id.* at 240 (Hess).  As ABB Limited's general

counsel testified, there was an endless series of requests for information which substantially

burdened ABB personnel.  *Id.* at 239 (Hess).

Mr. Austern retained the law firm of Swidler Berlin as bankruptcy counsel to advise

him on commercial matters.  NT 5/1/03 at 298 (Austern).  As a result of his due diligence Mr.

---

[12](...continued)

> transactions, based on our assessment as to the reasonableness
> of the valuations prepared at that time and based on the fact that
> really the contributions made by US ABB in our view
> overwhelm any possible dollar amount of claims in conjunction
> with, again, the practicalities of bringing those suits, which
> again I have personal experience with. That is why we did not
> include any possible recovery from any possible fraudulent
> conveyance actions.

NT 5/2/03 at 181 (Zilly).

[13]The $400 million that went into the CE Settlement Trust was not considered as
coming back into the estate in a chapter 7 by Ms. Zilly in her liquidation analysis.  NT 5/2/03
at 172-73.  She testified that "it would be very difficult to get those monies back and that any
sort of a preference action would not be sustainable and would take an extraordinary length of
time and ultimately not recover value under a liquidation recovery."  *Id.* at 173.  Although not
a lawyer, Ms. Zilly based her conclusion on experiences she has had in other cases where such
actions have been unsuccessful.  *Id.* at 174.

21

Austern insisted on enhancements to ABB Limited's contribution to the plan. To satisfy him, guarantees of ABB Limited's obligations in connection with the Plan were obtained from valuable subsidiaries as provided in the ABB Credit Support Term Sheet. *See* NT 4/24/03 at 248 (Hess); NT 5/1/03 at 342-43 (Austern); NT 5/2/03 at 14-15 (Austern); NT 5/2/03 at 80, 83, 87, 144-16 (Radecki). It was further agreed among the parties that the applicability of the §524(g) channeling injunction would be revisited in the event that ABB defaulted on its financial commitments to the Plan. NT 4/24/03 at 249 (Hess). In addition, ABB Limited gave limited consent to jurisdiction in the United States. That is, if there is an uncured financial default by ABB Limited in connection with its financial obligations under the plan, ABB Limited consents to the jurisdiction of this Court for purposes of dealing with the consequences of that default. Hrg. Tr. 5/1/03 at 32-33 (Statement of David Bernick, counsel to US ABB).

Other enhancements to the Plan included the following:

(1) ABB Limited will provide $100 million more in additional payments from 2006 through 2011, of which $50 million is contingent upon ABB's performance over a four-year period of time.[14] The other $50 million is not contingent.

(2) Credit support for all of the ABB $350 million contributions was developed.

(3) Originally, the Asbestos PI Trust was going to receive the CE stock but that was changed to a $20 million note convertible to 80 percent of CE stock upon[15] successful

---

[14]The $100 million depends on the EBIT margin. NT 4/24/03 at 244 (Hess).

[15]In essence, the Term Sheet says the $20M secured note is convertible to 80 percent of the outstanding equity securities at the option of the holder at a price equal to the greater of (continued...)

22

completion of the environmental remediation. *See* Term Sheet attached as Exhibit A to Plan, Hrg. Exh. 1; NT 5/1/03 at 300-01 (Austern).

(4) US ABB agreed to assume responsibility for remediation of one of the sites for which CE has environmental liability. Originally, the Asbestos PI Trust had the responsibility. NT 5/1/03 at 301 (Austern). The cost of remediation was estimated at $100 million. *Id.*

(5) ABB Limited and US ABB agreed that some potential indemnities that could have been channeled to the Asbestos PI Trust would not be.

(6) If Lummus is sold, the Asbestos PI Trust will receive $5 million from that transaction. NT 5/1/03 at 300-01 (Austern).

(7) ABB also agreed to accelerate the $250 million in payments to which it originally agreed. The payment period was shortened from five to three years. NT 5/1/03 at 301-02 (Austern). This development puts money into the Asbestos PI Trust sooner and reduces the risk attendant to ABB Limited's financial status.

(8) ABB Limited also agreed to guarantees[16] by certain subsidiaries. Mr. Austern testified that these guarantees were satisfactory to him. NT 5/2/03 at 14-15 (Austern). *See also* NT 5/2/03 at 78-87 (Radecki) (the amount Mr. Austern negotiated was as much as could

---

[15](...continued)
the then outstanding principal amount of the note or 80 percent of the then fair market value of the assets of the reorganized Debtor determined at that time by an independent appraiser and as if the note did not encumber the Connecticut site.

[16]Documentation of the guarantees was being drawn up by May 2, 2003. NT 5/2/03 at 94 (Radecki).

23

be obtained) and the credit support agreement[17] which included the guarantees mitigated risk.[18]

As to asbestos claims, Plan distribution operates through a CE Trust Distribution Procedure ("TDP"). Under the Plan, the Trust Distribution Procedures are essentially the same as those historically used by CVCSC. NT 5/2/03 at 220 (Dickhoff). The CE TDP is similar to the Manville TDP with respect to the medical issues but under the CE TDP a claimant must identify his job site; under the Manville TDP there is a job site table. NT

---

[17]Mr. Austern testified that he relied on opinions given him by CIBC to support his conclusion that the credit support provided in connection with the ABB Limited guarantees reduced the risk of nonpayment by ABB Limited. NT 5/1/30 at 333 (Austern). Joseph J. Radecki of CIBC World Markets Corp. testified. He is an investment banker and a managing director in its leverage finance group. He also heads the firm's financial restructuring and distress advisory practice. NT 5/2/03 at 60 (Radecki). His testimony confirmed that of Mr. Austern; i.e., he testified that "the amount of proceeds that had been negotiated by the futures representatives was as much as I believe the negotiations would bear, were largely as much as [he] believed that other finance parties of ABB would allow under the current circumstances and that the credit support ... agreement underlying that stream of payments took care of the risks". NT 5/2/03 at 87 (Radecki).

[18]Under the ABB Credit Support Agreement, ABB retains the right to sell ABB Turbo Systems Holding Limited and if that occurs, the obligations under the ABB Turbo Systems guarantee shall automatically cease whether satisfied or outstanding. The Credit Support Agreement further provides that ABB shall have no obligation to replace the ABB Turbo Systems guarantee or otherwise satisfy any obligations of Turbo Systems. NT 5/2/03 at 13-14 (Austern)(Turbo Systems is owned by ABB Limited and has produced approximately $60 to $66 million of cash flow on a U.S. currency basis between 1999 and 2002 with no debt. NT 5/2/03 at 85 (Radecki). ABB Participation AB is an intermediate holding company that owns 100 percent of the stock of ABB Nordon. ABB Nordon is one of the largest operating units of ABB Limited, accounts for roughly forty percent of the general ABB groups' revenues, and is worth approximately a billion dollars. *Id.* at 86. Thus, even if Turbo is sold, there is sufficient value in Nordon to maintain the integrity of the Credit Support Agreement and therefore of ABB Limited's contribution. Mr. Austern testified he relied on Mr. Radecki's advise regarding this and was satisfied. NT 5/2/03 at 14-15 (Austern).

24

5/1/03 at 360 (Austern). The Plan trust is funded, in part, by assignment of insurance
proceeds.

The insurers were not part of the prepetition negotiations and objected to the Plan on
the basis that their rights under their policies and/or settlement agreements were affected
without their consent through Plan provisions that require assignment of the rights to receive
proceeds under the policies to the Asbestos PI Trust. Mr. Brett testified, however, that the
TDP in this case reflects the practice that CVCSC used and insurers were aware of that
practice. NT 5/12/03 at 45 (Brett). Although the TDPs do not provide for insurers to have a
say in what claims are paid (the Asbestos PI Trust trustees and claims reviewers decide), the
insurers did not have such input prepetition. *Id.* at 46 (Brett). The same situation exists with
respect to the CE Settlement Trust. That is, the protocol for payment of CE Settlement Trust
claims is the same as what CVCSC had been doing and various insurers had reviewed the
process in the past. *Id.* at 48 (Brett). Excess carriers with high levels of excess coverage may
not have monitored the process prepetition because they would not yet have been affected. *Id.*
at 49 (Brett). Further, the protocol and criteria for the MSA are again substantially the same.
*Id.* at 73 (Brett).[19] I find that the Plan does not change whatever rights the insurers had
prepetition regarding payment of claims.

At the hearing on May 13, 2003, counsel for the Committee represented that there had
been changes to the TDP as the result of the Committee's demands. One was the creation of a

_____

[19]The insurers' rights are not affected by the CE Settlement Trust. There were no
insurance contributions to the CE Settlement Trust; the funding of the CE Settlement Trust
came from CE assets. During the course of the trial on the Disclosure Statement and Plan it
was agreed by the Plan Proponents that the insurers' contractual and legal rights would not be
affected by the terms of the Plan.

25