60-day window after the Effective Date (later increased to a 70-day window) for current claimants who had not been included in the MSA to file claims. Those who do will receive accelerated payment from the Plan. The other change is a reversal in the payment order of the stub claimants, in other words, as modified, the first to be paid will be the settled administrative claims, then Category 3, then Category 2, then Category 1. The purpose of paying in reverse order from that originally proposed is to equalize distributions. That is, stub claimants who got the highest amount (95 percent) under the MSA will get the last distribution from the Plan and those who received the 37½ percent will be paid first.[20] Hrg. Tr. 5/13/02 at 261-62 (Remarks of Joseph Frank, Esquire, for the Committee). As now provided in the Plan, therefore, the TDP gives known claimants who have not yet settled with CE the ability to file a claim within +a 70-day window and to be paid with priority. It also pays the stub claims in reverse order; i.e., those with the largest stub claims get paid before those with the smallest stub claims, thereby making more equal the combined CE Settlement Trust and Plan distributions among the creditors.

The insurers who are party to settlement agreements with CE, whereby they have agreed to the amount they will pay toward asbestos claims, objected to the plan because the Plan originally provided that indemnity agreements under the settlements will be channeled to the Asbestos PI Trust which would not be sufficiently funded to pay the indemnities. The insurers with indemnity agreements argue that they should at least be able to vote on the plan.

_____

[20] The modifications to the Plan also deleted the requirement that a claimant's first exposure had to before 1972. Hrg. Tr. 5/12/03 at 262 (Frank). I find that the modification to the order of payment materially enhances the distribution to Category 3, leaves Category 2 unaffected and represents a de minimis, non-material change to Category 1 whose remaining five percent claim will likely receive little through the Plan in any case.

The Plan provides that the only impaired creditors are those holding Asbestos PI Trust claims and Non-Debtor Affiliate intercompany Claims and holders of equity interests. The insurers insist that they are impaired[21] but the Plan has been modified to make clear that ***nothing*** impairs their rights. Because their rights are unimpaired, they are not entitled to vote and there is no occasion to address in the Plan or adjudicate in this confirmation process non-core issues such as potential breach by Debtor that might lead to a claim by insurers. The insurers insist that the Plan provision(s) regarding assignment of insurance proceeds to the Asbestos PI Trust and the way that asbestos claims will be examined by the Asbestos PI Trust impairs the insurers' rights. It was agreed that the rights of insurers shall be determined under the subject insurance policies or subject insurance agreements as applicable and nothing in the Plan is to affect that. The confirmation order will so provide. Therefore, this issue is moot because, as now modified, the Plan leaves the insurers unimpaired and, if and when their indemnity claims are allowed, they will be paid 100 percent in either Class 3 or Class 4. They will not be channeled to the Asbestos PI Trust. Moreover, the testimony and evidence at trial established that (a) very few insurers have indemnity agreements with Debtors and (b) it is unlikely that those indemnities will ever come into play. For example, Mr. Brett testified that an indemnity agreement between INA (variously referred to as ACE and Century

---

[21]The insurers may have claims against the estate to the extent actions taken in the future trigger events under the policies or insurance settlement agreements. Whether this will ever occur cannot be known at this point but what is certain is that certain insurers hold contingent unliquidated claims which makes them creditors of this estate. As long as their rights are not impaired, they are not entitled to vote on the Plan and the Plan is confirmable with respect to this issue.

Indemnity) and Basic[22] was over ten years old and no demand to pay the indemnity had yet

arisen. NT 5/12/03 at 73 (Brett).

In summary, there is no litigation pending that would implicate the indemnities.[23]

Therefore, the potential for recovery on these indemnities is purely speculative at this point.

In the event that there is litigation that kicks the indemnities into play, the merits of the claims

will be addressed at that time.

The insurers contend that the Plan is not feasible in that there will be insufficient funds

to pay the indemnities, which I have valued at zero. I find that the Plan is feasible.

The contributions to the Plan are as follows:

From CE:

> its right to the proceeds under its remaining insurance policies
> and settlement agreements covering asbestos personal injury
> claims, the face amount of which exceeds $320 million;[24] all of

---

[22]In 1992 Basic and INA entered into a settlement which was structured so that INA paid Basic a sum of money in exchange for releases and for dismissal of some lawsuits that were pending at the time. NT 5/12/03 at 59 (Brett).

[23]References to three state court lawsuits referred to as *Wise I, Wise II*, and *Cashman*, allegedly implicate the indemnities. As explained on the record, I value the indemnity claims at zero for Plan confirmation purposes. The three actions are against the insurers directly, alleging, *inter alia*, a conspiracy to commit unfair settlement practices on statutory grounds. NT 4/24/03 at 302 (Rice). They do not involve the contractual indemnities. Moreover, only Travelers was involved in settling claims for CE until CVCSC took over. Travelers does not have an indemnity. There cannot be a conspiracy of one.

[24]Mr. Brett testified that included in CE's contributions is $92 million due under settlement agreements with insurers. NT 5/2/03 at 276 (Brett). There is between $198 million and $200 million in total insurance coverage. *Id.* at 280 ($200 million is the face amounts of unexhausted products liability coverage by solvent insurers and is available for Asbestos PI Trust claims under policies that don't contain asbestos related exclusion). There is $92 million due but not paid from insurers with respect to pre-1977 claims. NT 5/2/03 at 287
(continued...)

its cash, which is approximately $51 million as well as its future
excess cash flows in accordance with the Term Sheet attached
to the Plan; and a $20 million secured note, convertible at any
time by the Asbestos PI Trust into 80 percent of the outstanding
equity securities of the reorganized CE.

ABB Limited is contributing, on its behalf and on behalf of the other Non-Debtor Affiliates:

30,298,913 shares of its stock, which Ms. Zilly testified was
worth in excess of $82 million, NT 5/2/03 at 156 (Zilly); a
financial commitment to pay $250 million to the Asbestos PI
Trust from 2004 through 2006, with up to $100 million of
additional payments from 2006 through 2011, half of which is
contingent on ABB's future financial performance; guarantees
of that financial commitment by various ABB affiliates as
provided in the ABB Credit Support Term Sheet; and the
release of all claims and interest of the ABB group in insurance
covering CE's asbestos personal injury claims.

US ABB is contributing:

an indemnification of all of CE's environmental liabilities,
which has been estimated to be worth at least $100 million; a
release of its indemnification rights against CE for asbestos
claims asserted against US ABB after June 30, 1999; and if
Lummus is sold within 18 months of the Plan's Effective Date,
an additional $5 million to the Asbestos PI Trust and $5 million
to the CE Settlement Trust; a $5 million Limited Carrier
Indemnity.[25]

The contributions of Lummus and Basic are:

---

[24](...continued)

(Brett). The primary insurers in this regard are Cigna (also referred to at trial as ACE or
Century Indemnity) and CNA. NT 5/12/03 at 63 (Brett). Mr. Austern testified that "major
portions" of the insurance asset are recoverable. NT 5/1/03 at 324 (Austern). Insurance
proceeds is the "second largest asset" coming into the Asbestos PI Trust. NT 5/1/03 at 321
(Austern).

[25]The indemnity claims are in Class 4 of the Plan except to the extent that they are
unclassified administrative claims or workers' compensation claims, in which case they will
be in Class 3. *See* Remarks of David Bernick, Theodore Freedman, counsel for Asea Brown
Boveri, Inc., 5/12/03 at 260.

> the release and assignment to the Asbestos PI Trust of all of
> their rights to proceeds under insurance covering asbestos
> personal injury claims, including certain policies shared with
> CE. In addition, US ABB is contributing almost $38 million on
> account of the asbestos claims attributable to Basic and
> Lummus.

Although there was some confusion at trial, I find that the evidence and testimony

support a finding that post-confirmation the Reorganized Debtor will have $51 million

available to pay administrative and Class 3 and Class 4 claims. The $51 million will remain

in the Debtor until these claims are paid in full. The Term Sheet was amended to be

consistent with the Plan in this regard. *See* Hrg. Tr. 5/12/03 at 263-64. Any balance will go

into the Asbestos PI Trust except for $3 million which will remain with the Reorganized

Debtor. Hrg. Tr. 5/2/03 at 323-26 (colloquy). Moreover, US ABB has guaranteed $5 million

of CE's obligation regarding the indemnities. In exchange for its contributions to the

Asbestos PI Trust, CE will be released from and indemnified against all Asbestos PI Trust

Claims, which claims will be channeled under §524(g) of the Bankruptcy Code to the

Asbestos PI Trust. Likewise, the ABB parties contributing to the Plan, their affiliates and

certain other parties will also receive general releases and indemnification for Asbestos PI

Trust Claims and certain other claims, as well as the benefits of a channeling injunction (the

"Asbestos PI Channeling Injunction") with respect to Asbestos PI Trust Claims. These

actions further enhance feasibility.

Since the bankruptcy was filed, Debtor has settled issues with some of its insurers,

thereby resolving some objections. Debtor and Liberty Mutual settled their dispute with

respect to the plan and the settlement was approved by order of this court dated May 13, 2003,

at docket no. 780. Andritz, Inc., now known as Andritz AG also settled with Debtor, as approved by this court on May 23, 2003. Docket no. 862.

One of the issues that arose at the Plan confirmation hearing revolves around the $20 million fee being paid to Mr. Rice by ABB for his services in assisting in getting claimants to sign onto the MSA.[26] The Certain Cancer Claimants (CCC) allege that he cannot serve as Claimants' Representative because he has a conflict of interest and further that he must disgorge the $20 million or any part thereof he has received.[27] Mr. Brett testified that neither US ABB nor CE approached Mr. Rice. He did not know whether ABB Limited had done so. Brett Deposition 3/26/03 at 47-48. It is ABB Limited that agreed to pay Mr. Rice's fee. NT 5/1/03 at 59 (Rice).[28] The fee was structured as a success fee to be paid in installments. *Id.* At least one payment has been made. Although Debtor did not pay Mr. Rice, the issue of whether he has a conflict of interest that tainted the vote was contested at trial. I find that the

---

[26]Mr. Rice testified that he was not involved with negotiation of the prepackaged Plan. NT 5/1/03 at 165 (Rice). He was involved in the Babcock and Wilcox case and the BMW case. The TDP in this case was modeled on the TDPs in those cases. Mr. Rice was not involved in adjustment of those TDPs to the instant case. NT 5/1/03 at 165-66 (Rice).

[27]The implication in designating someone as a "Claimants' Representative" is that the person in that position is disinterested and working for the interests of all claimants. Mr. Rice clearly is not disinterested. He feels that he represented only his own tort clients while simultaneously accepting $20 million from an entity with the opposite stake in the proceedings. To the extent that US ABB is contributing to his fee, he is further conflicted because US ABB is a creditor by virtue of CE's indemnity. *See* note 7, *supra*. US ABB is also a debtor to CE by virtue of the $402 million note and indemnity. Even if Mr. Rice's conduct failed to meet appropriate ethical standards such that the fee would be subject to disgorgement, the $20 million would not come into the Debtor's estate because it was not paid by the Debtor.

[28]The Disclosure Statement provides at ¶6.8 that ABB Limited and US ABB are paying the $20 million success fee.

prepetition vote was not tainted under the unusual circumstances of this case.[29] Although Mr. Rice was representing his own clients, his role with respect to the prepetition events was to contact and inform other law firms representing asbestos personal injury claimants with respect to the Master Settlement Agreement and to communicate offers of settlement to CVCSC which was handling claims against CE. Mr. Rice was chosen for this role because he is well acquainted with the plaintiff's bar and knew who the players are. Mr. Hess confirmed Mr. Rice's testimony. Mr. Hess testified that it was his understanding that the asbestos litigation was controlled by several plaintiffs' lawyers and that it was necessary to find someone who could coordinate negotiations with representatives of the asbestos plaintiffs' bar. NT 4/24/03 at 235 (Hess). Because the banks were not willing to provide financing absent evidence that a realistic solution for Debtor's asbestos liabilities was in the offing there was not time to negotiate with between 15 and 25 law firms. *Id.* Mr. Rice was chosen to focus on coordinating negotiations with the various asbestos plaintiffs' law firms. *Id.* at 236.[30]

---

[29]There was some concern expressed at trial that Mr. Rice would be chosen to be on the TAC for this Debtor. In fact, he had been named to the TAC, Hrg. Tr. 5/12/03 at 306-07 (Remarks of Theodore Freedman, counsel for ABB Limited), but has been replaced by Russell Budd, one of his attorneys in this case. To the extent that the Plan or any Plan documents purport to leave open the possibility that Mr. Rice will be a member of the TAC, the provision is expressly disallowed. Mr. Rice wears too many hats with respect to this Debtor and its creditors. He represents asbestos victims with claims in this case. He has an actual conflict of interest in that his fee is being paid by an entity that is the (indirect) parent of the entity he was suing prepetition (CE). He represents parties who are suing insurers, the result of which may be to create indemnity claims against the estate. In the latest iteration of the Plan and Plan Documents, Russell Budd, Mr. Rice's counsel, was named as a TAC member in place of Mr. Rice. However, it is likely that Mr. Budd as Mr. Rice's counsel also has a conflict and is not able to serve.

[30]There was an objection to Mr. Rice's testimony on the ground that his testimony was "induced by and produced by the improper contingent fee agreement." *See, e.g.*, NT 4.24.03
(continued...)

32

Mr. Rice testified that the asbestos plaintiffs' bar would not take his word with respect
to the merits of the Master Settlement Agreement. *See* NT 5/1/03 at 55 (Rice). He testified
that he did not represent future claimants. *Id.* He testified that it was never "suggested" that
he represent anyone other than his own clients, *id.*, even though there are documents and the
Disclosure Statement that refer to him as "Claimants' Representative". Nonetheless, Mr. Rice
is being paid both by ABB and by his clients who have claims against CE and/or who are
suing entities in the ABB group. The Disclosure Statement as submitted for approval by this
Court revealed that Mr. Rice is to receive $20 million as a "success fee" from ABB Limited
and US ABB. The Disclosure Statement states that Mr. Rice is "Claimants' Representative",
*see* Glossary of Terms as Modified Through the Seventh Technical Modifications through
June 4, 2003, Dkt. no. 892, but, he testified that he represented only his own clients in the
negotiations leading to the MSA. NT 5/1/03 at 54-54 (Rice). Obviously, Debtor, ABB
Limited and US ABB believed Mr. Rice's role to be much broader but no application to retain
him has been filed, nor could he be retained as a Claimants' Representative, *inter alia*,
because he has a conflict of interest as to the estate, due to his employment and payment by
Debtor's parent which is a creditor of Debtor. Thus, he could not comply with
Fed.R.Bankr.P. 2014.

I find that Mr. Rice has an actual conflict of interest in this case. He is being paid $20
million by the parent of an entity he is suing. In addition, he has tort clients who have claims

---

[30](...continued)
at 297. However, the findings we make are supported by the record and the objection is
overruled. There was no evidence that Mr. Rice's testimony was "tainted" by the fee he is
receiving from Debtor's grandparent.

against Debtor and/or another ABB related entity and he has contingency fee agreements with those clients who will be or have been paid through the CE Settlement Trust, NT 5/1/03 at 111-12 (Rice), and/or by the Asbestos PI Trust. At a minimum, he is required to obtain the informed consent of his tort clients to the arrangement but he testified that he does not have written waivers from any of his clients.[31] Mr. Rice testified that he sent a letter to his own clients and to all law firms participating in the MSA disclosing the fee. NT 5/1/03 at 105 (Rice). He also testified, however, that he did not notify his own clients or obtain waivers or authorization with respect to the fee before or after entering into the agreement with ABB but that he received communications from clients "during the course of the process providing ... support and powers of attorney after disclosure of the fee situation...."   NT 5/1/03 at 115 (Rice).

This Court has equitable power to fashion a remedy. Having failed to obtain waivers, Mr. Rice and firm are prohibited from collecting any fees from tort clients as the result of distributions they have received or will receive through the CE Settlement Trust or through the Asbestos PI Trust unless, within 60 days he informs his clients, in writing, of the existence and nature of his conflict, obtains written waivers from those clients, and certifies to this Court that he has or has not obtained the waivers. If he does not obtain waivers, he must return all fees to those clients not waiving the conflict and is precluded from collecting further fees with respect to them. He must also refer all non-waiving clients to other counsel within the 60 day period prescribed herein. Mr. Rice may not collect any fees going forward with

---

[31]Mr. Rice so testified in deposition although his brief states that he obtained waivers. At trial he confirmed that he had not obtained waivers.

respect to this matter until he obtains waivers.

I note that Mr. Rice also represents the plaintiffs in *Wise I*, *Wise II* and *Cashman*. The *Wise* case alleges a statutory cause of action under §33-11-4 of the West Virginia Code and a cause of action alleging conspiracy to violate that section against insurers. This portion of the West Virginia Code concerns unfair methods of competition and unfair or deceptive practices. The complaint asserts that the insurers intentionally misrepresented facts or insurance policy provisions regarding coverage and failed to adopt and implement reasonable standards for prompt investigation of claims. NT 3/24/03 at 303 (Rice). It is also alleged in the state court action that the insurers refused to pay claims without investigation. *Id.* at 303-04. The plaintiffs are those who have resolved claims against Debtor and now seek recovery from the insurers. None of the plaintiffs in the *Wise* case are creditors of Debtor. The plaintiffs in the *Cashman* case are those who have resolved claims for non-malignant disease. At the time of his testimony Mr. Rice had not determined whether any of them had signed a release or waiver with respect to a later malignant disease. With that caveat, he testified that the *Cashman* plaintiffs were not creditors of this estate. *Id.* at 301. Debtor is not named as a defendant in either case. *Id.* at 305. Only insurers are named.[32]

---

[32] *Wise I*, Exhibit 124 at ¶ 49, specifically limits the action to provisions of the West Virginia statute concerning unfair claim settlement practices and specifically disavows any action that arise out of the underlying asbestos personal injury claims. The asbestos claims are covered by the policies. The allegations in *Wise II* and *Cashman* are similar in that the claims are limited to unfair claims settlement practices. *See* Exhibit 122, ¶ 30. The plaintiffs in *Cashman* disavow any actions with respect to underlying asbestos personal injury and wrongful death, etc. The asbestos claims are those which would be indemnified under the settlements but are expressly excluded from the *Wise* and *Cashman* complaints. The indemnities that CE gave under the settlements with insurers are for claims arising under the policies which were released through the settlements. Those claims are not at issue in *Wise* or

(continued...)

35

I find that the process by which Mr. Rice was identified as the "Claimants'
Representative" at times and not at others and the $20 million fee to be paid is inappropriate
but I have no jurisdiction to compel repayment or to prevent payment by ABB Limited.
However, to the extent the Plan or Plan Documents provide that Mr. Rice or his counsel in
this case has any part in the Asbestos PI Trust, TDP, or TAC, that provision is expressly
disallowed. I note that the latest TDP provides that nothing prevents the TAC from
contracting with third parties to provide services to the Asbestos PI Trust. Neither the TDP
nor the TAC identify those parties. The Plan Confirmation Order will provide that this
provision is not to be construed to allow Mr. Rice or his firm or his counsel to participate in
any way with respect to the operation of the Asbestos PI Trust through serving as a Trustee or
on the TAC.

I find that the solicitation process prepetition was fair and designed to reach all known
CE claimants. Debtor solicited votes through counsel. Inasmuch as most were represented by
counsel, NT 5/1/03 at 212-13 (Rice),[33] I find that there was no prejudice created by the
misrepresentation that Mr. Rice was Claimants' Representative.

Wendy Cappola testified for the Plan Proponents. She is director of operations and

---

[32](...continued)

*Cashman.* The insurers' argument seems to be that, nonetheless, someone may raise the issue
thereby triggering the indemnity. Of course, anyone can sue for anything. The question is,
whether the plaintiff can win, something which is improbable. Therefore, the indemnities are
valued at zero for purposes of plan voting. One agreement requires CE to indemnify the
insurer for contribution claims but the allegations in the *Wise* and *Cashman* cases do not assert
a claim for contribution.

[33]Mr. Rice testified that he was not aware of any unrepresented asbestos claimants but
people are being diagnosed every day. NT 5/1/03 at 212.

36

technology for Trumbull Associates which prepetition was the noticing and balloting agent in this case. Approximately 350 plaintiffs' counsel were sent an e-mail with a letter from Debtor's counsel asking how they preferred to receive solicitation materials for their clients. NT 5/2/03 at 267-68 (Cappola). Trumbull attempted to contact by telephone those firms that did not respond to the e-mail. *Id.* at 268. Both master and individual ballots were sent out. Master ballots required a valid power of attorney. *Id.*[34] Law firms that did not provide a valid power of attorney were contacted. *See also* note 31, *supra.* If a master ballot was sent in that did not have a power of attorney, CVCSC or Trumbull would contact counsel to send the power of attorney. CVCSC would make the contact if it had a record of the power of attorney for a particular firm.[35] When the dust cleared and all valid powers of attorney were accounted for and all votes tabulated, the vote was overwhelmingly in favor of the Plan (97.2 percent in favor).[36] Once the ballots were received they were reviewed for eligibility.[37] Of the non-

_____

[34]Some claimants had powers of attorney on file with CVCSC and Trumbull and CVCSC would exchange information. If a claimant had a power of attorney on file with CVCSC, CVCSC would so inform Trumbull. NT 5/2/03 at 269 (Cappola).

[35]There was an issue with respect to ballots sent in by the Goldberg Persky firm. Mr. Dickhoff testified that the firm maintained that several thousand ballots were not counted. The firm asserted that the ballots should have been counted and that it had sent powers of attorney to CVCSC. However, there were many claims submitted by the firm that were filed after the November 14, 2002, cutoff date. claims at CVCSC to investigate. The firm had sent in several boxes of claims filed after the November 14, 2002, cutoff date for the MSA. These claims, therefore, were not eligible for inclusion in the MSA. The power of attorney issues was resolved when the powers of attorney were located. The firm's clients voted against the Plan. NT 5/2/03 at 221-22 (Dickhoff). The recalculation did not change the fact that more than sufficient votes were acceptances.

[36]The insurers, as noted, contended that the Plan impaired their rights and could not be confirmed as they had not been solicited and had not voted. This objection was cured when the Plan was modified to provide that none of the insurers' rights under either their policies or

(continued...)

37

participants in the MSA there were 13,651 votes in favor of the Plan and 3,241 against out of 111,000 proper votes. NT 5/12/03 at 240 (Dickhoff). There were 125,000 votes not counted since they were not accompanied with powers of attorney. Of those, 45,000 rejected the Plan. *Id.* at 241. Thus, sufficient votes in favor of the Plan were received.

Certain of the releases and injunctions in the Plan are contested. The Plan purports to release nondebtors which are also non-contributors to the Plan and to release independent claims of Basic and Lummus. Specifically, the ABB parties, their affiliates and certain other parties are to receive general releases and indemnification for Asbestos PI Trust claims and certain other claims as well as the benefits of a §524(g) channeling injunction. ABB's OGP companies include entities owned directly or indirectly by CE and although CE does not believe that any of them would be liable for Asbestos PI Trust claims, the Plan provides that these businesses and their purchaser are "Asbestos Protected Parties" and "Released Parties" under the Plan. In 2002 an affiliate of Debtor and indirect subsidiary of ABB sold ABB's structured finance business to certain direct and indirect subsidiaries of the General Electric Company. These purchasers are concerned about being sued for CE's asbestos liabilities. The likelihood that they would have any liability for asbestos related to CE is negligible. The Debtor does not believe that any of the Structured Finance Protected Parties have asbestos liability either but the Plan provides that the channeling injunction covers them as well.

---

[16](...continued)

settlement agreements would be affected by anything in the Plan, Plan documents, or confirmation order.

[17]A form for powers of attorney was set up. If a master ballot was received with a power of attorney that differed from the form, the power of attorney was sent to Debtors' counsel for review. NT 5/2/03 at 271-72 (Cappola).

Neither the OGP entities nor the Structured Finance Parties are contributors to the Plan.

To the extent an OGP or Structured Finance Part is sued for CE's liability, they are covered by the §524(g) injunction. Their own, direct, non-CE related liability, if any, is not within §524(g) and is not protected by the injunction.

Alstom is a proper subject for §524(g) relief. Alstom is the current owner of CE's former operating assets and is named as a defendant in asbestos suits against CE. Without Alstom in the plan, CE will have to indemnify Alstom.[38]

CE and US ABB want the ss524(g) injunction to cover Lummus and Basic for both CE-related claims and for direct claims. The specific requirements of §524(g) provide, at (4)(A)(i), that, *inter alia*, the injunction can be applied to "bar any action directed against a third party who is identifiable from the terms of such injunction ... *and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor*", *id.* (emphasis added), if the third party has an ownership of a financial interest in the debtor or its affiliate or predecessor in interest, it was involved in the management of the debtor, its predecessor, or served as officer, director, or employee of the debtor or a related party, it provides insurance to the debtor or a related party or was involved in a transaction changing the debtor's or a related party's corporate structure. *Id.* Basic and Lummus fulfill none of these conditions except the provision of shared insurance with Debtor, applicable to asbestos

---

[38]There was a sale in December of 1999 of what was Debtor's fossil power generating assets to a subsidiary of the joint venture now owned by Alstom. As part of the dissolution of the joint venture, US ABB agreed to indemnify the Alstom entities for asbestos-related claims asserted against Alstom based on prior affiliation with Debtor or ownership of Debtor's assets. Debtor undertook to indemnify and defend US ABB for any CE asbestos liability claim asserted US ABB after June 30, 1999.

liabilities. I find that §524(g) permits shared liabilities to be covered but does not permit the inclusion of direct claims against Lummus and Basic that are not also claims against CE.

Under the Plan, Lummus and Basic are releasing and assigning to the Asbestos PI Trust all proceeds under insurance regarding asbestos coverage, including shared insurance and US ABB is contributing almost $38 million to cover claims attributable to Lummus and Basic. Plan Proponents' Proposed Findings of Fact as of June 4, 2003, at ¶ 72. The amount being contributed by US ABB is apportioned as follows: $28 million for Lummus claims and $9,720,400 for Basic claims. Mr. Austern testified that historically $2.6 million has been paid for Lummus claims and $2.3 million for Basic claims. NT 5/1/03 at 312-13 (Austern). The amounts available to pay claims against Lummus are, in Mr. Austern's words, "hugely higher" than anything he has seen with respect to asbestos trusts and, with respect to Basic, "sort of unheard of". *Id.* at 312. Mr. Austern testified that if the shared insurance does not come into the Asbestos PI Trust, the trust runs the risk of not having the use of that insurance. NT 5/1/03 at 313 (Austern). Mr. Austern testified that it is important for the value of the 30 million shares of stock that ABB is contributing to the plan and the $350 million commitment it is making that Lummus be sold and Lummus cannot be sold with asbestos liabilities. NT 5/1/03 at 314 (Austern). With respect to Basic, the $9 million in insurance that is being contributed was characterized by Mr. Austern as a gift because Basic has been out of business. *Id.* Mr. Austern testified, "I don't know how you'd ever get it otherwise." *Id.*

Basic and Lummus are former subsidiaries of CE. Debtor acquired Basic in 1978. *See*

Brett Affidavit. By 1970[39] Debtor had acquired 100 percent of Lummus.[40] In January 1990 US ABB acquired Debtor in a leveraged buyout for $1.6 billion. This was approximately 20 years after CE stopped using asbestos products. In mid-1999 the joint venture with Alstom was formed. Effective July 1, 1999, all of CE's stock was transferred to the joint venture (ABB Alstom Power). There were two indemnities related to liabilities that were transferred to the joint venture. In a 1999 Transfer Agreement, US ABB agreed to reimburse CE for the uninsured portion of asbestos-related claims open and pending as of June 30, 1999. CE undertook to indemnify and defend US ABB for any CE asbestos liability claim asserted against US ABB after June 30, 2000.

In May 2000 the joint venture was dissolved due to business differences between US ABB and Alstom, including a dispute over liability for asbestos-related claims against CE. US ABB therefore purchased Debtor's stock but due to an intervening transfer in late December 1999 of what was CE's fossil power generating assets to a subsidiary of the joint venture now owned by Alstom, CE's only remaining asset is certain real property, some cash, and insurance assets. It also has a note in the range of $400 million on which ABB was obligated. NT 4./24/03 at 229 (Hess). *See also* Brett Affidavit. As part of the dissolution of

---

[39] The 1970s saw a major decline in electricity consumption and a virtual cessation of demand for new power plants. This resulted in a decline in new orders and cancellation of existing orders for CE's power generation equipment. The impact on CE's sales and operating results was delayed, however, due to the long manufacturing lead times for the equipment. The effect was felt by CE first around 1982 and it has never recovered from what a dramatic downturn resulting in significant losses through the 1980s.

[40] In 1930 Debtor and Babcock and Wilcox each acquired a 45 percent interest in ABB Lummus Global, Inc. ("Lummus"). Lummus management retained the remaining ten percent. In 1957 Debtor acquired Babcock and Wilcox's interest in Lummus. By 1970 Debtor had acquired management's shares as well to own 100 percent of Lummus. *See* Brett Affidavit.

the joint venture, US ABB agreed to indemnify the Alstom entities for asbestos-related claims

asserted against them based on their prior affiliation with Debtor or ownership of Debtor's

assets. (Brett Affidavit.) To the extent Lummus and Basic are sued as a result of their prior

affiliation with Debtor or other relationship with Debtor as provided in §524(g)(4), the

channeling injunction is properly applied to them. The §524(g) channeling injunction cannot

apply to Basic's and Lummus's independent liabilities, however, as that type of protection for

a nondebtor is simply not available under §524(g).[41]

      Because §524(g) does not authorize it, the question arises whether §105(a) permits a

stay of proceedings and channeling injunction against Lummus and Basic for their direct

liabilities.[42] This question was answered in the affirmative in *In re Dow Corning*

*Corporation*, 208 F.3d 648 (6th Cir. 2002). Although not binding on this Court, *Dow Corning*

sets out a practical analysis to address situations such as that facing CE. The *Dow*

*Corning* court found that enjoining claims against a nondebtor was appropriate where seven

factors were met. These factors are:

> (1) there is an identity of interests between the debtor
> and the third party, usually an indemnity relationship, such that

---

[41] Plan Proponents at ¶ 126 of the June, 4, 2003, Proposed Findings of Fact refer to §524(g)(4)(A)(ii)(I) which "contemplates that past or present affiliates for whose operations the debtor may be liable are entitled to" the channeling injunction. However, subsection (I) says "the third party's <u>ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor</u>". This section is not on point. The Debtor owned them; they did not own Debtor.

[42] In *A.H. Robins Co., Inc.*, 880 F.2d 694 (6th Cir. 1989), the court found that §524(c) does not limit the equitable power of the bankruptcy court to enjoin certain suits against third parties where the injunction was necessary to the plan and to a workable reorganization. Such is the situation here, provided that the Plan Proponents satisfy the factors stated in *In re Dow Corning Corporation*, 208 F.3d 648 (6th Cir. 2002).

> a suit against the nondebtor is, in essence, a suit against the
> debtor or will deplete the assets of the estate;
>
>     (2) the nondebtor has contributed substantial assets to
> the reorganization;
>
>     (3) the injunction is essential to reorganization, namely,
> the reorganization hinges on the debtor being free from indirect
> suits against parties who would have indemnity or contribution
> claims against the debtor;
>
>     (4) the impacted class, or classes, has overwhelmingly
> voted to accept the plan;
>
>     (5) the plan provides a mechanism to pay for all, or
> substantially all, of the class or classes affected by the
> injunction;
>
>     (6) the plan provides an opportunity for those claimants
> who choose not to settle to recover in full and;
>
>     (7) the bankruptcy court made a record of specific
> factual findings that support its conclusions.

280 F.3d at 658.

In this case, I find that factors 1, 2 and 3 are met. Factor 7 is met by these Findings.

Without an injunction in favor of Lummus and Basic, the shared insurance would not be

available to the Asbestos PI Trust, ABB would not contribute and its subsidiaries would not

guarantee ABB's contributions to the Plan and the creditors would not receive the substantial

benefits ABB is providing. Lummus and Basic are contributing all of their shared insurance,

which provides CE with access to funds without the need to litigate with co-insureds. CE and

Lummus shared insurance for the period of 1963 to 1985. From 1952 to 1963 Lummus had

its own coverage. *See* NT 5/1/03 at 274 (Gilbert). Continued lawsuits against Basic and

Lummus may drain insurance so that it is not available to fund CE's Plan. Mr. Austern

testified, with respect to claims against Lummus and Basic, that were a small number of

claims coming in over a substantial period of time. NT 5/1/03 at 310-11 (Austern). Further,

for both Basic and Lummus, the ratio of claims closed without payment versus claims closed

43

with payment was extraordinary, in Mr. Austern's view. He testified that he had never seen anything like it, in his considerable experience with asbestos cases. *Id.* at 311-12. CE shares an identity of interest with ABB, Lummus and Basic because ABB's need to sell Lummus, *inter alia*, instigated ABB's willingness to contribute to CE's plan funding. There are approximately 7,500 lawsuits naming Non-Debtor Affiliates with CE. Except for certain claims against Basic and Lummus, all of these claims are derivative of CE's alleged asbestos liability. In light of this and the substantial contributions ABB Limited and US ABB are making on behalf of the Non-Debtor Affiliates, they are appropriately included in the channeling injunction, with the exception of independent claims against Basic and Lummus.

Factors 4 and 5 are not clearly established on this record. However, remedial action may cure any defect. Regarding factor 4 (voting), the testimony was that Lummus creditors voted overwhelmingly in favor of confirmation. However, whether creditors who have claims only against Lummus and only against Basic were provided the opportunity to vote is not clear. I recommend that, with respect to factor 4, the District Court provide the Debtor ten days to file an affidavit and produce the affiant at a deposition for cross-examination, then file the transcript, with respect to what, if any, effort was made to identify, notify and solicit votes from creditors with claims only against Lummus and only against Basic; i.e., not shared with CE. If the affidavit does not establish some direct notice to those holding non-derivative claims against Lummus and Basic (or if no affidavit is filed), I recommend that Debtor be required to notify and solicit the direct Lummus and Basic creditors before confirmation is approved. If the affidavit and deposition establish notice, I recommend that the District Court find that this factor has been met.

44

Regarding factor 5, the Plan proposes to pay Lummus and Basic claims through the Asbestos PI Trust. I accept Mr. Austern's testimony that there is a separate "pot" or amount of money coming in for CE claims, one for Lummus claims, and one for Basic claims. NT 5/1/03 at 313 (Austern). However, there are no documents filed of record to support that testimony. The $38 million contribution from US ABB is not segregated from other Asbestos PI Trust assets. More significantly, the existing TDP provides that its purpose is to pay CE liabilities. There is no TDP regarding payment of Lummus or Basic liabilities. I therefore recommend that the Debtor be provided ten days to file appropriate "TDP type" documentation to establish funds and mechanisms to pay Lummus and Basic direct creditors. That is, the Debtor should be provided an opportunity to file documentation that will (a) establish the fund and the distribution process for Lummus, and (b) establish the fund and distribution process for Basic. If this is done, I recommend that the District Court find this factor has been met.

With respect to factor 6, I accept Mr. Austern's testimony that contribution into these separate pots provides a significant ratio of funds available to pay claims and that the Plan meets this factor as supported by the historical claims experience of Lummus and Basic. *See, e.g.,* NT at 312 (Austern). These amounts are sufficient to provide the opportunity to pay any non-accepting creditor of Lummus or Basic.[43] I recommend withholding confirmation, however, until the Trust documents needed to satisfy factor 5 and the affidavit and deposition transcript in connection factor 4 are filed. If those documents do not establish some direct

---

[44]I note that the record established that Basic is inactive and appears to be insolvent. Moreover, no one has objected to the proposed treatment of Basic's direct obligations.

45

notice, then I recommend that Debtor be required to notify and solicit the independent Lummus and Basic creditors before confirmation is approved. If the documents establish the requisite notice, I recommend that the Plan be confirmed.

Thus, although §105(a) may be available for the intended purpose, the Plan as of June 4, 2003, does not comply with the *Dow Corning* factors. Therefore, the Plan Proponents should be given the opportunity to (1) notify claimants with claims solely against Lummus and Basic of the requested injunction and solicit their votes; if this was already done, provide evidence of that fact;[44] (2) clearly establish the process by which Lummus and Basic creditors will be paid and from what funds (as of now, no funds have been segregated for their payment and no distribution procedures are of record).

Certain Cancer Claimants object to the fact that the funds in the CE Settlement Trust are not included in the Asbestos PI Trust. One Cancer Claimant, Victor Trinchese, filed an adversary complaint alleging a fraudulent transfer to bring the assets of the CE Settlement Trust into the Asbestos PI Trust. Debtor has maintained that the CE Settlement Trust is not an estate asset. Mr. Austern testified that he did not believe that the future claimants would fare as well if the transfer is avoided as they will under the Plan and the Asbestos PI Trust as now constructed. NT 5/1/03 at 366-67 (Austern). The Plan originally proposed to release the CE Settlement Trust from avoidance actions. I refused to permit that release because of the pending Trinchese adversary. I credit Mr. Austern's testimony concerning the futility of pursuing the action for Plan confirmation purposes, but find that the appropriate resolution of

_____

[44]Mr. Dickhoff testified that there were 1,147 votes by Lummus claimants for the Plan and seven votes against. NT 5/2/03 at 313 (Dickhoff).

46

the issue on the merits is to permit the parties to complete the adversary.

There were objections lodged to the Plan asserting that this was a liquidation case and not a reorganization because the Debtor had no business left. Pamela Zilly, senior managing director at the Blackstone Group, testified as an expert as to Debtor's liquidation value, among other things. She testified that Debtor has a continuing real estate business in that it rents out buildings. NT 5/2/03 at 141-42, 172, 193-94 (Zilly). I agree that Debtor is continuing in business post-confirmation. Further, the Bankruptcy Code provides for single-assert bankruptcies.

With respect to the liquidation analysis, Ms. Zilly calculated the total amount available to Debtor minus expenses (including fees and expenses of a trustee and the trustee's professionals), and priority claims. She calculated the amount available under the Plan based on contributions and subtracted expenses there as well. NT 5/2/03 at 139-54; 154-58 (Zilly). She concluded that creditors would fare better under the Plan than in a liquidation. In a liquidation CE would not have the additional insurance contributions it has under the Plan, it would retain the environmental liabilities on property it owns, it would not have the note or stock being contributed by ABB. In chapter 7 assets available to Debtor would be between $210 million and $250 million. NT 5/2/03 at 154 (Zilly). Under the Plan after the effective date CE would be holding $50 million in cash. NT 5/2/03 at 155 (Zilly). Under the Plan assets available to Debtor would be between $640 million and $789 million (after deductions). NT 5/2/03 at 157 (Zilly).[45] Mr. Austern's testimony was consistent with Ms. Zilly's in that in

---

[45]When asked if she had considered all of CE's assets in her liquidation analysis, Ms. Zilly testified that she had except that "technically missing under a postpetition analysis would
(continued...)

47

a chapter 7 or without any bankruptcy at all  future claimants would get next to nothing. *See*
NT 5/1/03 at 325 (Austern),[46] and find the liquidation alternative is satisfied.

With respect to feasibility of the Asbestos PI Trust and the estimation of future claims,
Dr. Timothy Wyant testified for the CCC. He testified that under the CE Settlement Trust the
distribution would be about 59 cents on the dollar. NT 5/1/03 at 147 (Wyant). Under the
Asbestos PI Trust he testified that future claimants would receive about 18 cents on the dollar.
NT 5/12/03 at 146 (Wyant). On cross-examination he testified that he used the methodology
that he did because the data were well suited to it. *Id.* at 156 (Wyant). However, he did not
explain how or why it was well suited except to say that CE is typical of those to which the
method is applied. *Id.* at 151 (Wyant). He noted that the recent surge in asbestos claims
filings may be an aberration, *id.* at 147, and so he assumed that the 2001 level would persist
through 2004 after which there would be a decline. *Id.* at 149. He calculated the decline by
pro rating the claims each year against the Nicholson curve, which is based on epidemiologic
studies in the 1980s of occupationally exposed workers, and builds into it how many more
cancers will occur from past exposure to asbestos in the work place and how those incidences
of disease will decline in the future. NT 5/12/03 at 149 (Wyant). This method focuses only
on mesothelioma and lung cancer. *Id.* at 150. He further testified that the majority of future

---

[45](...continued)
be" CE's real estate business going forward which is cash neutral. NT 5/2/03 at 172 (Zilly).
By this she meant, in short, that due to the environmental liabilities associated with that real
estate, it would not have a value. *Id.* at 190-94.

[46]Mr. Austern further testified that fraudulent transfer actions would result in ABB
stock "being absolutely wiped out" resulting in future claimants' receiving, if not nothing,
then substantially less than they will receive under the Plan. NT 5/1/03 at 325 (Austern).

48

claims would be non-malignancies, *id.* at 152, but that the malignancy curve is used for non-malignant situations because there is no curve for non-malignancies. *Id.* at 177. He testified that a shortfall of even $100 million in postpetition funding would not affect his estimates. *Id.* at 152-53. He further testified that there was no statistical test applied to the propensity ratio for 2001 and no statistical test with respect to the ratio remaining constant, although he did say that "the test in this circumstance is a very specific term of art", *id.* at 171, and that "[t]here was a statistical assessment in that there were clearly defined assumptions there ... reflecting how actual data is projected into the future." *Id.* at 172.

Nothing in Dr. Wyant's testimony or presented thereafter throughout the course of this trial established what the standard for predicting future claims is or that Dr. Wyant used it. He testified that his methodology for estimating asbestos liabilities has not been published in a peer review journal of statistics, *id.* at 192-93, and he was not aware of any publication in /a peer review journal in the field of statistics regarding asbestos estimation. NT 5/12/03 at 193 (Wyant). Dr. Wyant further testified that the Nicholson curve that he applied does not instruct calculation of claims propensity or calculation of a non-malignant ratio. *Id.* at 198 (Wyant). Thus, although his testimony provides food for thought, it is not of probative value for the purpose for which it was elicited.

Dr. Frederick C. Dunbar of the National Economic Research Assistance ("NERA") testified for the Plan Proponents. Dr. Dunbar was asked to evaluate the difference between the prepetition and postpetition payouts testified to by Dr. Wyant. He testified that he computed the statistical error associated with Dr. Wyant's forecast of claims by looking at variances and co-variances of the ratios Dr. Wyant estimated. Those variances were given a

49

weight which gave a measure of the standard error which is also called the "prediction interval". This is a standard test used for statistical forecasting. NT 5/12/03 at 226-27 (Dunbar). With respect to Dr. Wyant's testimony that it is appropriate to use confidence intervals for hypothesis testing, Dr. Dunbar testified that the determination of whether there is a statistical difference between the payouts under the CE Settlement Trust and the Asbestos PI Trust is an example of hypothesis testing. He explained that Dr. Wyant's belief was that the postpetition payouts will be less than 59 cents on the dollar, which statisticians call the "null hypothesis". If Dr. Wyant is correct with respect to the postpetition payouts, the statistical analysis allows him to reject the hypothesis. NT 5/12/03 at 227-28 (Dunbar). However, in order to do that, a confidence interval would have to be used and Dr. Dunbar testified that Dr. Wyant did not calculate a confidence interval for payouts under the prepetition and postpetition trusts. *Id*. at 228. Dr. Dunbar, however, made that calculation which he explained through page 230 of the May 12, 2003, transcript. He testified on cross-examination that the selection of the confidence interval is done by using professional standards and that there are professional and legal standards for confidence intervals. *Id*. at 231-32 (Dunbar). Dr. Dunbar further testified that Dr. Wyant used a simplified model as compared to the way such forecasts are usually performed. *Id*. at 232. He used, at best, nine parameters whereas NERA uses 70 for a small producer and 2,500 for producers with a number of occupations. *Id*. at 232-33. Because he used so many more parameters, he was able to account for things like, age, jurisdiction and occupation that Dr. Wyant's model did not consider. *Id*. at 233. He also testified that he did not make a ratio based on lung cancer to forecast non-malignant diseases which have a shorter latency period. *Id*. He testified not that

50

any of Dr. Wyant's numbers were wrong, as such, but that there was a question of the probability of "getting another estimate from the same type of data if you re-sample within a range." NT 5/12/03 at 234 (Dunbar). He could not state that a particular point was the most accurate forecast. *Id.* at 235. His conclusion was that there is not a statistically significant difference between the payout under the postpetition trust and the prepetition trust. I find that Dr. Wyant's methodology did not include all factors that it should have included and so should not be accorded much weight. In light of Dr. Wyant's overly simplified model, and in light of the complexities of estimating future claims, I find that Dr. Dunbar's conclusions are more reliable in this context. I accept Dr. Dunbar's and Ms. Zilly's testimony that future claims cannot be accurately estimated. NT 5/2/03 at 157-58 (Zilly)(she did not estimate future claims in chapter 7 or chapter 11 because the estimate is indeterminable both as to number and type and, therefore, amount); Declaration of Frederick C. Dunbar, CE Conf. Hrg. Exhibit 183 at 2. *Cf.* NT 5/2/03 at 230 (Dunbar)(there is no statistically significant difference between the payout under the CE Settlement Trust (prepetition) and the Asbestos PI Trust (postpetition). I also find that, based on Ms. Zilly's liquidation analysis and Mr. Austern's testimony, the Plan proposes to pay more for future claims than would be paid under a chapter 7 bankruptcy, a "freefall" bankruptcy, or no bankruptcy at all.

I find that the Plan would be confirmable under 11 U.S.C. §1129, as modified through June 4, 2003, subject to the recommendations made herein with respect to the fourth and fifth factors of *In re Dow Corning Corporation*, 208 F.3d 648 (6th Cir. 2002), i.e., factor 4 (Debtor's filing of affidavit and deposition regarding notice and solicitation of Lummus and Basic creditors), and factor 5 (Debtor's filing of documentation that will establish the funds

51

and the distribution processes for Lummus and Basic). To the extent the rulings are based on issues that are non-core, the District Court will make the final determination.

I find that the Plan complies with the applicable provisions of 11 U.S.C. §1129(a)(1), and that the Plan Proponents have done so as well, §1129(a)(2). Further, the Plan has been proposed in good faith and not by any means forbidden by law. *Id.* at (a)(3).

Section 1129(a)(4) provides that

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the, the court as reasonable.

I find that the Plan complies with (a)(4). I find that all fees were reasonable except those to Mr. Rice. He is being paid by ABB Limited which is "a person issuing securities ... under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case...." but the fee is not subject to the approval of this Court.

The Disclosure Statement states that the Reorganized Debtor will be managed by its board and that on or before the Effective Date the Debtor will adopt an amended certificate of incorporation and other corporate documents. Although this information should be in the Plan, 11 U.S.C. §1129(a)(5)(A)(i), I find that the information in the Disclosure Statement on this point is consistent with the interests of creditors, equity security holders, and public policy, *id.* at (ii), and that the Plan Proponents have disclosed any insiders who will be retained by Reorganized Debtor and the nature of their compensation, *id.* at (B). Subsection

(a)(6) regarding regulatory commissions and rate changes is not applicable to this Debtor.

I find that with respect to each impaired class of claims or interests, the holders receive or retain at least what they would receive or retain under a chapter 7.  11 U.S.C. §1129(a)(7). I refer in particular in this regard to Ms. Zilly's testimony and to that of Dr. Dunbar but note that the overwhelming body of testimony and evidence establish that this Plan is in the best interests of all creditors.  Other classes have either accepted the Plan or are not impaired.  11 U.S.C. §1129(a)(8).  Specifically, the insurers' rights under their policies and settlement agreements are not affected by anything in the Plan or Plan Documents, as was explained at trial and clarified by changes to the Plan and Plan Documents.

I find that §1129(a)(9) and (10) have been complied with and that confirmation is not likely to be followed by liquidation or the need for further reorganization of the Debtor or Reorganized Debtor, *id.* at (a)(11).  In fact, the evidence and testimony established that under this Plan creditors and especially future asbestos claimants will receive more than would be possible in a chapter 7 scenario or if the Debtor had not filed bankruptcy at all.

In addition, I incorporate by reference all the findings in §7.10 of the Plan.  I Retain jurisdiction as provided in the Plan and recommend that the District Court retain jurisdiction as provided in the Plan for all non-core matters.

With respect to §524(g) I find that the Plan is confirmable except with respect to inclusion of the independent claims of Basic and Lummus in the channeling injunction. However, §105(a) permits the court to issue a channeling injunction in these circumstances. *See In re Dow Corning Corporation*, 208 F.3d 648 (6th Cir. 2002); *A.H. Robins Co., Inc.*, 880 F.2d 694 (6th Cir. 1989).

53

Extension of the channeling injunction under §524(g) to the OGP entities and the Structured Finance Protected Parties is appropriate only as to liabilities shared with CE.

The Plan is otherwise confirmable in that the §524(g) injunction is to be implemented in connection with the Asbestos PI Trust which is created pursuant to the Plan.  11 U.S.C. §524(g)(2).

The Asbestos PI Trust will assume the Debtor's liabilities  and the Debtor has been named as defendant in personal injury actions which injuries are alleged to have been caused by the presence of  or exposure to asbestos or asbestos containing products, §524(g)(2)(B)(i)(I).  The Asbestos PI Trust is to be funded by securities of the Debtor and Debtor's obligations to make future payments,  §524(g)(2)(B)(i)(II).  Inasmuch as the Asbestos PI Trust will own 80 percent of Debtor's stock upon successful remediation of the contaminated real estate it owns, subsection (g)(2)(B)(i)(III) is met.[47]  The Plan further provides that the Asbestos PI Trust will use the assets to pay claims and demands, §524(g)(2)((B)(i)(IV).

In addition, I find that the Debtor is likely to be subject to substantial future demands for payment arising out of its businesses, especially related to asbestos,  11 U.S.C. §524(g)(2)((B)(ii)(I), and that the actual amounts, numbers, and timing of those future claims

---

[47]There was argument at trial that the majority of ABB's stock had to be committed to the Plan but subsection (g)(2)(B)(III) says that the injunction is permissible if the trust "is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of (aa) each such debtor; (bb) the parent corporation of each such debtor; *or* (cc) a subsidiary ...."  Inasmuch as the section is stated in the alternative, the fact that the Asbestos PI Trust is to receive 80 percent of Debtor's stock is sufficient.  I note that although the Asbestos PI Trust is also to receive over 30 million shares of ABB stock, there was no evidence that that number of shares is a majority of the voting shares of ABB.

cannot be made. 11 U.S.C. §524(g)(2)(B)(ii)(II). Further, pursuit of the claims outside the Asbestos PI Trust would drain CE of all resources and exhaust its insurance coverage and would mean that future claimants would receive nothing. 11 U.S.C. §524(g)(2)(B)(ii)(III).

The terms of the injunction are set out in the Disclosure Statement and the Plan. 11 U.S.C. §524(g)(2)(B)(ii)(IV). I find that the Disclosure Statement is adequate with respect to the information provided to creditors at the time it was disseminated. All constituencies were represented at trial so she fact that the Plan changes do not affect the sufficiency of the Disclosure Statement. 11 U.S.C. §524(g)(2)(B)(ii)(IV)(aa).

I further find that those whose claims are to be subject to the Asbestos PI Trust voted in favor of the Plan by more than the requisite 75 percent; in fact, the vote in favor of the Plan was over 97 percent. 11 U.S.C. §524(g)(2)(B)(ii)(IV)(bb). Further, I find that the implementation mechanisms for the Asbestos PI Trust comply with §524(g)(2)(B)(ii)(V) in that they provide reasonable assurance that the Asbestos PI Trust will value, and will be in a financial position to pay, present claims and future demands involving similar claims in substantially the same manner.

An appropriate order will be entered.

*Date and signature on following page.*

cc: via e-mail to
The Honorable Alfred M. Wolin
Curtis Hehn, Esquire

It is **SO ORDERED**.

DATE: *June 23, 2003.*                    *Judith K. Fitzgerald*

                                          Judith K. Fitzgerald
                                          United States Bankruptcy Court